UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION

CIVIL ACTION NO. 3:06-CV-110-H

CRYSTAL SNYDER                                                                                    PLAINTIFF

V.

THE SULLIVAN UNIVERSITY                                                                  DEFENDANT

**MEMORANDUM OPINION**

This matter is before the Court on the motion of Defendant, The Sullivan University ("Sullivan") for summary judgment on Plaintiff Crystal Snyder's claims of disability discrimination under the Americans with Disabilities Act (ADA) and the Kentucky Civil Rights Act (KCRA). The Court has discussed the case thoroughly with counsel. Some aspects of this case are confusing. However, the evidence, or the absence of it, ultimately dictates that the Court grant Defendant's motion.

I.

The actual evidence stated most favorably to Plaintiff is important.

Plaintiff Crystal Snyder ("Snyder") worked in the accounts receivable/customer service department at Sullivan where she was supervised by Michele Thompson Springmeier ("Springmeier") who reported to Sheldon Bridges, Vice President of Finance.[1] Snyder was

---

[1] After she was hired by Sullivan, Snyder received the Sullivan Faculty/Staff Manual which states, in part, "the following conduct is prohibited and may subject the individual involved to disciplinary action up to and including termination: . . .(b) use of abusive language . . . (i) threatening or intimidating supervisors, students, or

diagnosed with bipolar disorder in 2004 and has received treatment and medication for psychological illness since 1994. Snyder informed her supervisors at Sullivan of her psychological illness and took a Family and Medical Leave Act ("FMLA") absence from work from September 23, 2004 to October 31, 2004.

After the FMLA leave, Snyder apparently returned to work without incident for almost a year. On August 10, 2005, Snyder was involved in an incident lasting approximately five minutes with a co-worker regarding a binder that the co-worker had left on or near Snyder's workspace. Snyder described her actions a "verbal outburst." Snyder admitted that she raised her voice, at one point leaning over the other co-worker's desk when the co-worker "yelled back stuff." Springmeier witnessed the incident and wrote two memoranda to her supervisor, Bridges, describing the episode. In the second memorandum, Springmeier stated that she believed Snyder to be at fault.

On Friday, August 12, 2005, Springmeier and Bridges met with Snyder regarding the incident. During this meeting, Snyder disagreed with Springmeier's characterization of the incident and her assessment that it was entirely Snyder's fault in the written memoranda and she became "agitated and more anxious." According to Snyder, the meeting ended when Bridges told her to go home after she had made repeated requests for a "break" because she felt unable to control her emotions.[2] When Snyder returned to work on Monday, August 15, 2005, she received Bridges' written termination memorandum referencing "unacceptable" and "inappropriate" behavior during the incident and during the August 12, 2005 meeting.

---

fellow workers." The Manual also states, "Discharge can be for any reason not prohibited by law . . . and Sullivan University System reserves the right to terminate employment for any reason."

[2]Bridges maintains that the meeting ended with Snyder "storming out."

2

Snyder claims that her termination violated the Americans with Disabilities Act ("ADA") and the Kentucky Civil Rights Act ("KCRA"). Sullivan disputes that Snyder is disabled for purposes of the ADA or KCRA and further argues that she was not fired because of any disability. Rather, Sullivan asserts that Snyder was terminated for a legitimate business reason, specifically for treating a co-worker inappropriately and for reacting unprofessionally when her supervisors confronted her about it.

I.

Sullivan has moved for summary judgment under Fed. R. Civ. P. 56. The Court will grant a motion for summary judgment if the evidence submitted shows that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986)(citing Fed.R.Civ.P. 56(c)). In applying Rule 56(c), a court views the evidence in a light most favorable to the non-movant. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158-59 (1970)). A court properly enters summary judgment where there is not sufficient evidence in support of the non-movant's case upon which "a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

II.

Snyder's primary claim is that her termination violated the Kentucky Civil Rights Act (KCRA).[3] Here, the parties have completed discovery. The issues presented are clear and the

---

[3] Plaintiff admits that she did not exhaust her administrative remedies for a disability discrimination claim under federal law. Therefore, she cannot pursue that claim in this Court. In these circumstances, the Court has some discretion over whether to retain the state law claim through the exercise of its supplemental jurisdiction. *See Tallon v. Lloyd & McDaniel*, 497 F. Supp.2d 847 (W.D. Ky. 2007)(citing *Weeks v. Portage County Exec. Offices*, 235 F.3d 275, 279-80 (6th Cir. 2000). In exercising this discretion, the district court should weigh "judicial economy, convenience, fairness, and comity." *Blakely v. United States*, 276 F.3d 853, 863 (6th Cir. 2002). The Court chooses

Court will not be faced with complex or novel state law questions in considering this case. The KCRA makes it unlawful for an employer "to discharge any individual . . . because the person is a qualified individual with a disability . . ." Ky. Rev. Stat. Ann. § 344.040. To establish a prima facie case of discrimination under the KCRA, Plaintiff must show "(1) that she had a disability as the term is defined under the KCRA; (2) that she was "'otherwise qualified' to perform the requirements of the job with or without reasonable accommodation;" and (3) that she "suffered an adverse employment decision because of the disability." *See Henderson v. Ardco, Inc.*, 247 F.3d 645, 649 (6th Cir. 2001)(interpreting KCRA disability protections consonant with ADA).

KCRA defines "disability" as "[a] physical or mental impairment that substantially limits one . . . or more of the major life activities[4] of the individual," or having "[a] record of such an impairment," or "[b]eing regarded as having such an impairment." Ky. Rev. Stat. Ann. § 344.010(4). The Supreme Court held in *Toyota Motor v. Williams*, 534 U.S. 184, 198 (2002) that "to be substantially limited in performing manual tasks, an individual must have an impairment that prevents or severely restricts the individual from doing activities that are of central importance to most people's daily lives." *See also Levinson*, 289 F.Supp.2d at 853 (recognizing the same conclusion about "disabled" under the ADA). The Sixth Circuit has recognized that the Court in *Williams* "emphasized that the term 'substantially limits' should be 'read strictly to create a demanding standard for qualifying as disabled.'" *Mahon v. Crowell*, 295 F.3d 585, 590 (6th Cir. 2002)(quoting *Williams*, 534 U.S. at 197).

---

to resolve the KCRA claim because it is "legally and factually intimately related to . . .[the] federal discrimination claim" and its resolution serves the interest of judicial economy. *See Levinson v. Mucker*, 289 F. Supp.2d 848, 854 (W.D. Ky. 2003); *see also Musson Theatrical, Inc. v. Fed. Express Corp.,* 89 F.3d 1244, 1254 (6th Cir. 1996).

[4]The EEOC regulations define "major life activities" as "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. §1630.2(i)(1998).

Here, Snyder asserts that her bipolar and related psychological disorders substantially limit her in four major life activities. Her best argument is that the disease substantially limits her ability to care for herself. She offers as evidence reports of a suicide attempt in 1993 followed by a period of hospitalization and two other periods of suicidal ideation in 1999 and 2005. These incidents exemplify Snyder's illness at its worst. However, three particularly acute episodes over the course of fourteen years do not permit the inference of any substantial residual limitation that restricts Snyder's ability to care for herself as would an average person. *See Horwitz v. L & J.G. Strickley, Inc.*, 122 F. Supp. 2d 350 (N.D. N.Y. 2000) (rejecting plaintiff's claim that her bipolar disorder restricted her ability to care for herself despite periods of high stress, depression, and mania since these episodes were isolated and sporadic). These episodes were of limited frequency and duration. Snyder has not offered evidence that her disorder prevents her from completing household tasks or other activities of central importance to her daily life.

Most tellingly, for a substantial period of time prior to the firing, Snyder lived alone and did successfully care for herself. Although Snyder has provided the Court with voluminous medical records, none of those records contain an opinion of Snyder's physician that she was unable to care for herself about the time she was terminated. *See McCarron v. British Telecom*, 2002 WL 1832843 (E.D. Pa. 2002) (finding sufficient evidence to establish a genuine issue of material fact with respect to whether the plaintiff's bipolar disorder substantially limited him in caring for himself where physician had provided a report stating that the plaintiff was limited in his ability to care for himself). In completing a FMLA questionnaire at Sullivan's request in the fall of 2004, Snyder's physician responded to a question of whether Snyder was incapacitated as

5

"not now as [Snyder's episode] was brief." Defendant's Exhibit 3 at 23. Moreover, Snyder testified that from December 2004 to August 2005 her moods were relatively stable. In sum, Snyder has failed to present any evidence that would permit an inference that her bipolar substantially limited her ability to care for herself especially in light of her acknowledged ability to do her own cooking, cleaning, and chores.

Snyder also argues that she is substantially limited in her ability to care for her children, as evidenced by Snyder's decision to permit her ex-husband to have custody of her youngest son in 2004. This Court could find no support within the Sixth Circuit for Snyder's position that caring for children is considered a major life activity for purposes of an ADA claim. However, even if caring for children could be considered a major life activity, Snyder's older son continued to live with her at the time she was discharged. This fact simply does not permit a conclusion that Ms. Snyder was substantially limited in her ability to care for her children.

Snyder asserts that she is substantially limited in her ability to learn because she performed poorly in high school and chose not to complete the college-level classes in which she was enrolled while she was employed at Sullivan. The Court would be strained to conclude that Snyder's performance in high school (before she received treatment for her psychological condition) could support a determination that she was substantially limited in learning at the time she was terminated from Sullivan. Moreover, Snyder's decision not to complete certain college-level classes while she maintained a full-time job does not raise a genuine issue of material fact as to whether Snyder was substantially limited in her ability to learn. *See Kazerooni v. Vanderbilt Univ.*, 2007 WL 2300379, at *9 (M.D. Tn. 2007) (noting "just as an inability to perform a particular job is insufficient to establish a disability in regard to working, the inability

6

to perform a particular activity for a particular educational course does not establish a disability in regard to working").

Finally, Snyder asserts that she is substantially limited in the major life activity of working. She claims that her illness would not permit her to work a third shift job because she could not adjust to altered sleep patterns. When "the major life activity under consideration is that of working, the statutory phrase 'substantially limits' requires, at a minimum, that plaintiffs allege they are unable to work in a broad class of jobs." *Cotter v. Ajilon Services,* Inc., 287 F.3d 593 (6th Cir. 2002)(quoting *Sutton*, 527 U.S. at 489). Snyder's reported inability to work a particular shift during the day is insufficient to establish that she is substantially limited in her ability to work a broad class of jobs. *See, e.g. Eibest v. Planned Parenthood of Stark County*, 94 F. Supp. 2d 873, 877 (N.D. Ohio 2000). Moreover, Snyder has successfully obtained non-third shift employment and she is currently employed full time. These factors lead the Court to the unavoidable conclusion that Snyder is not substantially limited in her ability to work a broad class of jobs.

Thus, Snyder has presented no evidence that supports a finding of a disability as defined by the applicable cases.

### III.

In the alternative, Snyder argues that she had a "record of" having an impairment by Sullivan. "A record of impairment means an individual has a 'history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" *MX Group, Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002)(quoting 28 C.F.R. § 35.104(3)). This argument is not very persuasive.

This Court has previously recognized that "[r]egardless of whether [Plaintiff] is proceeding under a classification or misclassification theory, the record-of-impairment standard is satisfied only if she actually suffered a physical impairment that substantially limited one or more of her major life activities." *Edwards v. Ford Motor* Co., 218 F.Supp.2d 846 (W.D. Ky. 2002) (quoting *Hilburn v. Murata Elec.'s N. Am., Inc.*, 181 F.3d 1220, 1229 (11th Cir.1999)). "The impairment indicated in the record must be an impairment that would substantially limit one or more of the individual's major life activities." *Hillburn*, 181 F.3d at 1229 *(*quoting 29 C.F.R. pt. 1630, App. § 1630.2(k)(1997)). Thus, claims under "record of impairment" would appear to succeed or fail for many of the same reasons as claims based on actual impairment because either requires a showing of an impairment that substantially limits one or more major life activities. *See id.; Colwell v. Suffolk County Police Dep't,* 158 F.3d 635, 645 (2nd Cir.1998)*.*

It is undisputed that Snyder informed her supervisors at Sullivan of her bipolar and related diagnoses both orally and through written documentation from her physician when she took a FMLA absence for her condition. That Sullivan may have had documentation of Snyder's illness does not, however, transform the degree to which the illness substantially limited Snyder such that she could pursue a claim under the "record of" prong of the KCRA. As discussed above, Snyder has failed to provide documentation to permit a conclusion that she had a record of a *substantial* impairment in any major life activity.

### IV.

Snyder's final claim that Sullivan "regarded her" as disabled under Ky. Rev. Stat. Ann. § 344.010(4) presents a somewhat closer question. The "regarded as" provision "is meant to cover those who do not presently suffer from a substantially limiting impairment, but are

8

regarded as having such an impairment." *MX Group*, 293 F.3d at 340. An employee can prove that she was "regarded as" disabled by two methods: (1) where the employer "mistakenly believes that a person has a physical impairment that substantially limits one or more major life activities, or (2) [an employer] mistakenly believes that an actual but nonlimiting impairment substantially limits a major life activity." *Edwards*, 218 F.Supp. 2d at 851 (quoting *Sutton,* 527 U.S. 471, 489 (1999)). Under either test, a plaintiff must show that the employer perceived her as disabled and discriminated against her on that basis. *MX Group, Inc.*, 293 F.3d at 340.

Consequently, under the first "regarded as" method, Snyder may state a claim under KRCA § 344.04(4) only if Sullivan mistakenly believed that her bipolar disorder substantially limited her ability to work. "To succeed upon a regarded as disabled claim, plaintiff must 'demonstrate that an employer thought he was disabled, [. . . and] that the employer though that his disability would prevent him from performing a broad class of jobs.'" *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 595 (Ky. 2003) (quoting *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001). The *Ross* court noted that under the "regarded as" prong 'membership in the protected class becomes a question of [the employer's] intent,' and observed that the question of an employer's motive is one "rarely susceptible to resolution at the summary judgment stage." 237 F.3d at 706. However, in a subsequent case affirming a district court's grant of summary judgment in favor of an employer facing a "regarded as" claim, the Sixth Circuit limited the holding of Ross to cases where the plaintiff has presented enough evidence to create a "genuine factual dispute as to whether the employer regarded its employee as unable to work." *See Smith v. Quikrete Co. Inc.*, 204 F.Supp. 2d 1003, 1011 (citing *Cotter v. Ajilon Services, Inc.*, 287 F.3d 593, 599-601 (6th Cir. 2002)).

Snyder asserts that Sullivan used its knowledge of Snyder's diagnosis and medication to "form the belief that [her] Bipolar Disorder was more debilitating than it actually was . . .[which] led Sullivan to distort a routine disagreement with a coworker into an extreme and outrageous act." However, having knowledge of an employee's bipolar disease and believing that it causes that employee to be substantially limited in her ability to work, are two vastly different matters of proof. The Court disagrees that differences in the accounts of the August 10 dispute provided by Snyder's supervisor, Springmeier, and the other eye-witness, Rachel Kaiser tend to prove the "regarded as" prong. Springmeier's perception of the incident is relevant to whether her proffered reason for termination was pretextual, and not whether she regarded Snyder as substantially limited in her ability to work. That different perceptions exist about the events of August 10 is relevant only to the former question once Snyder has established the latter.

None of the other testimony suggests that Sullivan officials believed Snyder could not work in a substantial number of jobs. On July 13, 2004, Springmeier sent Snyder an e-mail stating, "you need to watch the time away from your desk. You have been out four times already." Snyder argues that a August 24, 2004 letter written by Springmeier supports her view:

> . . .these absences are impacting your performance as well as the morale of the team. Therefore I am forced to take action. You've indicated that your absences are due to continuing medical problems. At this time I will need for you to provide me with a Certification from your Health Care Provider indicating the nature of your condition and the expected duration of the symptoms. With that information we can determine whether you may be eligible for coverage under our Family and Medical Leave of Absence policy. *Also if your physician inidciates you have a disability, we will need for you to complete the Request for Accommodation from indicating what type of support you*

>*might need from us due to this condition . . .*

Plaintiff's Response to Motion for Summary Judgment, Exhibit 3 at 19. However, this letter reveals that Sullivan had not reached any conclusions about the extent of Snyder's impairment and was prepared to chart its future relationship with Snyder based on the information provided by her physician. Thus, Sullivan does not appear to have relied on stereotypes to inform its view of Snyder's mental health condition, rather it sought medical information from her physician to inform its decision to grant Snyder's FMLA absence from work in the fall of 2004. Though Sullivan's grant of FMLA time to Snyder indicates that it accepted that her bipolar was a "serious health condition" for purpose of FMLA, there is no indication that Sullivan either resisted Snyder's return to work or believed that she could not work.[5] Moreover, as the excerpt from the August 24, 2004 letter reveals, Sullivan did not view eligibility for FMLA coverage as coextensive with whether someone was so disabled that they required an accommodation. Absolute proof of this is that Snyder continued to work at Sullivan without documented incident or comment for nearly a year after her FMLA leave.[6]

Springmeier did testify that Snyder "didn't appear to be happy," "had a chip on her shoulder," was "combative," and "difficult to get along with" at work and that she sometimes did not document incidents involving Snyder. Springmeier also testified that shortly after Snyder's return from FMLA in early November 2004, Snyder would cry at work and have "outbursts" or

---

[5] It would be counterproductive to the interplay of the FMLA and the ADA if the allowance of FMLA leave could put an employer at risk of liability under the "perceived as" prong of the ADA.

[6] According to Springmeier's testimony, the latest document in Snyder's employment file prior to the August 10 incident was a note written by Springmeier on November 18, 2004 in response to questions from Snyder's physician.

"would just completely go blank" when responding to requests from students for information. Springmeier further testified that the Snyder explained that her medication caused these changes. However, this testimony about Snyder's mood and attitude cannot be stretched to suggest that Sullivan regarded Snyder as "unable to work" because of her bipolar disorder. *See Ross*, 237 F.3d at 709 ("Not only must a plaintiff demonstrate that an employer thought he was disabled, he must also show that the employer though that his disability would prevent him from performing a broad class of jobs."). Springmeier described the period from the end of November 2004 until Snyder's termination as "on and off and on and off" and Snyder described the period as "relatively uneventful." Although Springmeier relieved Snyder of extra duties assigned to her regarding the CEF Program in 2004, this fact does not support an inference that Sullivan regarded Snyder as unable to complete a broad range of jobs, and Snyder retained the original duties of her job. No evidence thereafter suggests a concern that among Sullivan officials that Snyder was unable to perform a wide range of jobs. *See id.*

Viewed in the light most favorable to Snyder, the undisputed material facts reveal that Snyder is not disabled for purposes of the KCRA. Moreover, there is simply insufficient evidence to permit the conclusion that Sullivan believed that Snyder was unable to perform the duties of her job or many other jobs, even after Sullivan obtained medical documentation for purposes of granting the FMLA absence and despite Springmeier's opinions about Snyder's mood and her observation of Snyder's interactions with her co-workers.

The Court will enter an order consistent with this Memorandum Opinion.

cc:     Counsel of Record